Exhibit O

FROM CHICAGO TITLE INS CO

(WED) 3. 7' 01 11:57/ST. 11:42/NO. 4861310160 P 2

## AMERICAN LAND TITLE ASSOCIATION
## HOMEOWNER'S POLICY OF TITLE INSURANCE
## FOR A ONE-TO-FOUR FAMILY RESIDENCE
### (10-17-98)

# CHICAGO TITLE INSURANCE COMPANY

## Owner's Coverage Statement

This Policy insures You against actual loss, including any costs, attorneys' fees and expenses provided under this Policy, resulting from the Covered Risks set forth below. If the Land is located as an improved residential lot on which there is located a one-to-four family residence and each insured named in Schedule A is a Natural Person.

Your insurance is effective on the Policy Date. This Policy covers Your actual loss from any risk described under Covered Risks if the event creating the risk exists on the Policy Date or, to the extent expressly stated, after the Policy Date.

Your insurance is limited by all of the following:

- The Policy Amount shown in Schedule A
- For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A
- Exceptions in Schedule B
- Our Duty To Defend Against Legal Actions
- Exclusions on page 2
- Conditions on page 2 and 3.

## Covered Risks

The Covered Risks are:

1. Someone else owns an interest in Your Title.
2. Someone else has rights affecting Your Title arising out of leases, contracts, or options.
3. Someone else claims to have rights affecting Your Title arising out of forgery or impersonation.
4. Someone else has an easement on the Land.
5. Someone else has a right to limit Your use of the Land.
6. Your Title is defective.
7. Any of Covered Risks 1 through 6 occurring after the Policy Date.
8. Someone else has a lien on Your Title, including a:
   a. Mortgage;
   b. judgment, state or federal tax lien, or special assessment;
   c. charge by a homeowner's or condominium association; or
   d. lien, occurring before or after the Policy Date, for labor and material furnished before the Policy Date.
9. Someone else has an encumbrance on Your Title.
10. Someone else claims to have rights affecting Your Title arising out of fraud, duress, incompetency or incapacity.
11. You do not have both actual vehicular and pedestrian access to and from the Land, based upon a legal right.
12. You are forced to correct or remove an existing violation of any

covenant, condition or restriction affecting the Land, even if the covenant, condition or restriction is excepted in Schedule B.

13. Your Title is lost or taken because of a violation of any covenant, condition or restriction, which occurred before You acquired Your Title, even if the covenant, condition or restriction is excepted in Schedule B.

14. Because of an existing violation of a subdivision law or regulation affecting the Land:
   a. You are unable to obtain a building permit;
   b. You are required to correct or remove the violation; or
   c. Someone else has a legal right to, and does, refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it.
   The amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

15. You are forced to remove or remedy Your existing structures, or any part of them - other than boundary walls or fences - because any portion was built without obtaining a building permit from the proper government office. The amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

16. You are forced to remove or remedy Your existing structures, or any part of them, because they violate an existing zoning law or

CHICAGO TITLE INSURANCE COMPANY

By:

*John Raw*

President

By:

*Thomas J Adams*

Secretary

Authorized Signatory

[SEAL: CHICAGO TITLE INSURANCE COMPANY]

*Note: This policy shall not be valid or binding until countersigned by an authorized signatory.*

Reorder Form No. 8277
ALTA Homeowner's Policy of Title Insurance For A One-To-Four Family Residence (10-17-98)

FROM CHICAGO TITLE INS CO                    (WED) 3. 7'01 11:58/ST. 11:42/NO. 4861310160 P   3

## COVERED RISKS (Continued)

zoning regulation. If You are required to remedy any portion of Your existing structures, the amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

17.   You cannot use the Land because use as a single-family residence violates an existing zoning law or zoning regulation.

18.   You are forced to remove Your existing structures because they encroach onto Your neighbor's Land. If the encroaching structures are boundary walls or fences, the amount of Your insurance for this Covered Risk is subject to Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

19.   Someone else has a legal right to, and does, refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it because Your neighbor's existing structures encroach onto the Land.

20.   You are forced to remove Your existing structures which encroach onto an easement or over a building set-back line, even if the easement or building set-back line is excepted in Schedule B.

21.   Your existing structures are damaged because of the exercise of a right to maintain or use any easement affecting the Land, even if the easement is excepted in Schedule B.

22.   Your existing improvements (or a replacement or modification made to them after the Policy Date), including lawns, shrubbery or trees, are damaged because of the

future exercise of a right to use the surface of the Land for the extraction or development of minerals, water or any other substance, even if those rights are excepted or reserved from the description of the Land or excepted in Schedule B.

23.   Someone else tries to enforce a discriminatory covenant, condition or restriction that they claim affects Your Title which is based upon race, color, religion, sex, handicap, familial status, or national origin.

24.   A taxing authority assesses supplemental real estate taxes not previously assessed against the Land for any period before the Policy Date because of construction or a change of ownership or use that occurred before the Policy Date.

25.   Your neighbor builds any structures after the Policy Date – other than boundary walls or fences – which encroach onto the Land.

26.   Your Title is unmarketable, which allows someone else to refuse to perform a contract to purchase the Land, lease it or make a Mortgage loan on it.

27.   A document upon which Your Title is based is invalid because it was not properly signed, sealed, acknowledged, delivered or recorded.

28.   The residence with the address shown in Schedule A is not located on the Land at the Policy Date.

29.   The map, if any, attached to this Policy does not show the correct location of the Land according to the Public Records.

### OUR DUTY TO DEFEND AGAINST LEGAL ACTIONS

We will defend Your Title in any legal action only as to that part of the action which is based on a Covered Risk and is not excepted or excluded from coverage in this Policy. We will pay the costs, attorneys' fees, and expenses We incur in that defense.

We will not pay for any part of the legal action which is not based on a Covered Risk or which is excepted or excluded from coverage in this Policy.

We can end Our duty to defend Your Title under paragraph 4 of the Conditions.

This Policy is not complete without Schedules A and B.

## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.   Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:

   a.   building

   b.   zoning

   c.   land use

   d.   improvements on the Land

   e.   land division

   f.   environmental protection

   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.

   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2.   The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3.   The right to take the Land by condemning it, unless:

   a.   a notice of exercising the right appears in the Public Records at the Policy Date; or

   b.   the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

4.   Risks:

   a.   that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;

   b.   that are Known to You at the Policy Date, but not to Us, unless they appeared in the Public Records at the Policy Date;

   c.   that result in no loss to You; or

   d.   that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8d, 22, 23, 24 or 25.

5.   Failure to pay value for Your Title.

6.   Lack of a right:

   a.   to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and

   b.   in streets, alleys, or waterways that touch the Land.

   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

## CONDITIONS

1.   **DEFINITIONS:**

   a.   Easement – the right of someone else to use the Land for a special purpose.

   b.   Known – things about which You have actual knowledge. The words "Knew" and "Knowing" have the same meaning as Known.

   c.   Land – the Land or condominium unit described in paragraph 3 of Schedule A and any improvements on the Land which are real property.

   d.   Mortgage – a mortgage, deed of trust, trust deed or other security instrument.

   e.   Natural Person – a human being, not a commercial or legal organization or entity. Natural Person includes a trustee of a Trust even if the trustee is not a human being.

   f.   Policy Date – the date and time shown in Schedule A. If the insured named in Schedule A first acquires the interest shown in Schedule A by an instrument recorded in the Public Records later than the date and time shown in Schedule A, the Policy Date is the date and time the instrument is recorded.

   g.   Public Records – records that give constructive notice of matters affecting Your Title, according to the state statutes where the Land is located.

   h.   Title – the ownership of Your interest in the Land, as shown in Schedule A.

   i.   Trust – a living trust established by a human being for estate planning.

   j.   We/Our/Us – Chicago Title Insurance Company.

   k.   You/Your – the insured named in Schedule A and also those identified in paragraph 2.b. of these Conditions.

2.   **CONTINUATION OF COVERAGE:**

   a.   This Policy insures You forever, even after You no longer have Your Title. You can not assign this Policy to anyone else.

   b.   This Policy also insures:

      (1)   anyone who inherits Your Title because of Your death;

      (2)   Your spouse who receives Your Title because of dissolution of Your marriage;

      (3)   the trustee or successor trustee of a Trust to whom You transfer Your Title after the Policy Date; or

      (4)   the beneficiaries of Your Trust upon Your death.

   c.   We may assert against the insureds identified in paragraph 2.b. any rights and defenses that We have against any previous insured under this Policy.

3.   **HOW TO MAKE A CLAIM**

   a.   Prompt Notice of Your Claim

      (1)   As soon as You Know of anything that might be covered by this Policy, You must notify Us promptly in writing.

      (2)   Send Your notice to

            Chicago Title Insurance Company

            171 North Clark Street, MLC 0600, Illinois 60601-3294

            Attention: Claims Department.

FROM CHICAGO TITLE INS CO                    (WED) 3. 7' 01  11:59/ST. 11:42/NO. 4861310180  P. 2

and where the Land is located. Please enclose a copy of Your policy, if available.

   (3)   If You do not give Us prompt notice, Your coverage will be reduced or ended, but only to the extent Your failure affects Our ability to resolve the claim or defend You.

  b.  **Proof Of Your Loss**

   (1)   We may require You to give Us a written statement signed by You describing Your loss which includes:

     (a)  the basis of Your claim;

     (b)  the Covered Risks which resulted in Your loss;

     (c)  the dollar amount of Your loss; and

     (d)  the method You used to compute the amount of Your loss.

   (2)   We may require You to make available to Us records, checks, letters, contracts, insurance policies and other papers which relate to Your claim. We may make copies of these papers.

   (3)   We may require You to answer questions about Your claim under oath.

   (4)   If You fail or refuse to give a statement of loss, answer Our questions under oath, or make available to Us the papers We request, Your coverage will be reduced or ended, but only to the extent Your failure or refusal affects Our ability to resolve the claim or defend You.

### 4.  OUR CHOICES WHEN WE LEARN OF A CLAIM

  a.  After We receive Your notice, or otherwise learn, of a claim that is covered by this Policy, Our choices include one or more of the following:

   (1)   Pay the claim.

   (2)   Negotiate a settlement.

   (3)   Bring or defend a legal action related to the claim.

   (4)   Pay You the amount required by this Policy.

   (5)   End the coverage of this Policy for the claim by paying You Your actual loss resulting from the Covered Risk, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay.

   (6)   End the coverage described in Covered Risk 14, 15, 16 or 18 by paying You the amount of Your insurance then in force for the particular Covered Risk, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay.

   (7)   End all coverage of this Policy by paying You the Policy Amount then in force, and those costs, attorneys' fees and expenses incurred up to that time which We are obligated to pay.

   (8)   Take other appropriate action.

  b.  When We choose the options in paragraphs 4.a.(5), (6) or (7), all Our obligations for the claim end, including Our obligation to defend, or continue to defend, any legal action.

  c.  Even if We do not think that the Policy covers the claim, We may choose one or more of the options above. By doing so, We do not give up any rights.

### 5.  HANDLING A CLAIM OR LEGAL ACTION

  a.  You must cooperate with Us in handling any claim or legal action and give Us all relevant information.

  b.  If You fail or refuse to cooperate with Us, Your coverage will be reduced or ended, but only to the extent Your failure or refusal affects Our ability to resolve the claim or defend You.

  c.  We are required to repay You only for those settlement costs, attorneys' fees and expenses that We approve in advance.

  d.  We have the right to choose the attorney when We bring or defend a legal action on Your behalf. We can appeal any decision to the highest level. We do not have to say Your claim until the legal action is finally decided.

  e.  Whether or not We agree there is coverage, We can bring or defend a legal action, or take other appropriate action under this Policy. By doing so, We do not give up any rights.

### 6.  LIMITATION OF OUR LIABILITY

  a.  After subtracting Your Deductible Amount if it applies, We will pay no more than the least of:

   (1)   Your actual loss;

   (2)   Our Maximum Dollar Limit of Liability then in force for the particular Covered Risk, for claims covered only under Covered Risk 14, 15, 16 or 18; or

   (3)   the Policy Amount then in force;

   and any costs, attorneys' fees and expenses which We are obligated to pay under this Policy.

   (1)   If We remove the cause of the claim with reasonable diligence after receiving notice of it, all Our obligations for the claim end, including any obligation for Your loss You had while We were removing the cause of the claim.

   (2)   Regardless of 6.b.(1) above, if You cannot use the Land because of a claim covered by this Policy:

     (a)  You may rent a reasonably equivalent substitute residence and We

   (1)   the cause of the claim is removed; or

   (2)   We pay You the amount required by this Policy. If Your claim is covered only under Covered Risk 14, 15, 16 or 18, that payment is the amount of Your insurance then in force for the particular Covered Risk.

   (d)   We will pay reasonable costs You pay to relocate any personal property You have the right to remove from the Land, including transportation of that personal property for up to twenty-five (25) miles from the Land, and repair of any damage to that personal property because of the relocation. The amount We will pay You under this paragraph is limited to the value of the personal property before You relocate it.

  c.  All payments We make under this Policy reduce the Policy Amount, except for costs, attorneys' fees and expenses. All payments we make for claims which are covered only under Covered Risk 14, 15, 16 or 18 also reduce Our Maximum Dollar Limit of Liability for the particular Covered Risk, except for costs, attorneys' fees and expenses.

  d.  If We insure, or have insured, a Policy to the owner of a Mortgage that is on Your Title and We have not given You any coverage against the Mortgage, then:

   (1)   We have the right to pay any amount due You under this Policy to the owner of the Mortgage, and any amount paid shall be treated as a payment to You under this Policy, including under paragraph 4.a. of these Conditions;

   (2)   Any amount paid to the owner of the Mortgage shall be subtracted from the Policy Amount of this Policy; and

   (3)   If Your claim is covered only under Covered Risk 14, 15, 16 or 18, any amount paid to the owner of the Mortgage shall also be subtracted from Our Maximum Dollar Limit of Liability for the particular Covered Risk.

  e.  If You do anything to affect any right of recovery You may have against someone else, We can subtract from Our liability the amount by which You reduced the value of that right.

### 7.  TRANSFER OF YOUR RIGHTS TO US

  a.  When We settle Your claim, We have all the rights You have against any person or property related to the claim. You must transfer these rights to Us when We ask, and You must not do anything to affect these rights. You must let Us use Your name in enforcing these rights.

  b.  We will not be liable to You if We do not pursue these rights or if We do not recover any amount that might be recoverable.

  c.  We will pay any money We collect from enforcing these rights in the following order:

   (1)   to Us for the costs, attorneys' fees and expenses We paid to enforce these rights;

   (2)   to You for Your loss that You have not already collected;

   (3)   to Us for any money We paid out under this Policy on account of Your claim; and

   (4)   to Your whatever is left.

  d.  If You have rights under contracts (such as indemnities, guaranties, bonds or other policies of insurance) to recover all or part of Your loss, then We have all of these rights, even if those contracts provide that those obligated have all of Your rights under this Policy.

### 8.  ENTIRE CONTRACT

This Policy, with any endorsements, is the entire contract between You and Us. To determine the meaning of any part of this Policy, You must read the entire Policy. Any changes to this Policy must be agreed to in writing by Us. Any claim You make against Us must be made under this Policy and is subject to its terms.

### 9.  INCREASED POLICY AMOUNT

The Policy Amount will increase by ten percent (10%) of the Policy Amount shown in Schedule A each year for the first five years following the Policy Date shown in Schedule A, up to one hundred fifty percent (150%) of the Policy Amount shown in Schedule A. The increase each year will happen on the anniversary of the Policy Date shown in Schedule A.

### 10.  SEVERABILITY

If any part of this Policy is held to be legally unenforceable, both You and Us can still enforce the rest of this Policy.

### 11.  ARBITRATION

  a.  If permitted in the state where the Land is located, You or We may demand arbitration.

  b.  The arbitration shall be binding on both You and Us. The arbitration shall decide any matter in dispute between You and Us.

  c.  The arbitration award may be entered as a judgment in the proper court.

  d.  The arbitration shall be under the Title Insurance Arbitration Rules of the American Arbitration Association. You may choose current Rules or Rules in existence on Policy Date.

  e.  The law used in the arbitration is the law of the place where the Land is located.

  f.  You can get a copy of the Rules from Us.

Page 3

Issued By:

**Chicago Title Insurance Company**

Schedule A

OWNER'S POLICY

File No.: CA36724

Policy No.: 72151-76627924

Amount of Insurance: $299,900.00

Date of Policy: January 16, 2008 at 1:49 am

| Deductible Amounts and Maximum Dollar Limits of Liability For Covered Risk 16, 18, 19 and 21: | | |
|---|---|---|
| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
| Covered Risk 16: | 1.00 % of Policy Amount or $ 2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00 % of Policy Amount or $ 5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00 % of Policy Amount or $ 5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00 % of Policy Amount or $ 2,500.00 (whichever is less) | $ 5,000.00 |

Street Address of the Land:

1.  Name of Insured:

    STARSHA M. SEWELL by virtue of a deed, dated January 10, 2008, and recorded January 16, 2008, in the for the County of PRINCE GEORGE'S, as Instrument # 4361.

2.  Your interest in the Land covered by this Policy is:

    Fee Simple

3.  The Land referred to in this Policy is described as:

    Situate in the County of PRINCE GEORGE'S, State of Maryland:

    LOT NUMBERED SEVEN (7), IN BLOCK LETTERED "R" IN THE SUBDIVISION KNOWN AS "PLAT ONE, INDEPENDENCE ESTATES", AS PER PLAT THEREOF RECORDED IN PLAT BOOK WWW 35, PLAT 91, AMONG THE LAND RECORDS OF PRINCE GEORGE'S COUNTY, MARYLAND.

This Policy is valid only if Schedule B is attached.

ALTA Homeowner's Policy of Title Insurance (10-17-98)

---

**Issued By:**

**Chicago Title Insurance Company**

Schedule B

---

OWNER'S POLICY

File No.: CA36724

Policy No.: 72151-76627924

In addition to the Exclusions, You are not insured against loss, costs, attorneys' fees and expenses resulting from:

1.  TAXES, STATE, COUNTY AND MUNICIPAL AND OTHER PUBLIC CHARGES (INCLUDING, BUT NOT LIMITED TO, ASSESSMENTS BY ANY STATE, COUNTY, MUNICIPALITY, METROPOLITAN DISTRICTS OR COMMISSION) PAYABLE ON AN ANNUAL OR SEMI-ANNUAL BASIS.

    HOWEVER, THIS COMMITMENT/POLICY OF TITLE INSURANCE DOES NOT INSURE AGAINST POSSIBLE FUTURE TAX LEVIES AND/OR FRONTAGE BENEFIT ASSESSMENTS, NOR AGAINST SUCH PUBLIC CHARGES AND ASSESSMENTS, OR THE BALANCE THEREOF FOR EXISTING OR PROPOSED IMPROVEMENTS WHICH MAY HAVE BEEN LEVIED AND ASSESSED, OR TO BE LEVIED OR ASSESSED, BUT WHICH ARE NOT NOW DUE AND PAYABLE TO SAID STATE, COUNTY, MUNICIPALITY, METROPOLITAN DISTRICT OR COMMISSION.

    STATE, COUNTY AND MUNICIPAL TAXES AND OTHER PUBLIC CHARGES NOT NOW DUE AND PAYABLE, PLUS POSSIBLE SUPPLEMENTAL TAXES.

    TAX ACCOUNT NUMBER: 18-2079846.

2.  Covenants, conditions and restrictions, said exception omits any covenants or restrictions, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, contained in: contained in: Declaration of Covenants recorded at 2454/513.

3.  MINIMUM BUILDING RESTRICTION LINE PER OWNER'S DEDICATION ON RECORDED PLAT.

4.  SUBJECT TO WATER METER CHARGES DUE OR TO BECOME DUE, IF ANY.

5.  SUBJECT TO HOMEOWNERS CHARGES DUE OR TO BECOME DUE, IF ANY.

6.  MATTERS SHOWN ON THAT CERTAIN PLAT OF SURVEY BY NTT ASSOCIATES,INC., C.L.S., DATED JANUARY 3, 2008, PROVIDED TO THIS COMPANY.

7.  Deed of Trust dated October 10, 2008, from STARSHA M. SEWELL to DAVID E. WATERS and ANTHONY B. OLMERT, SR., Trustees, securing FIRST HOME MORTGAGE CORPORATION in the

Countersigned:

CAPITAL AREA TITLE, LLC D/B/A

By: _____
    Authorized Officer or Agent

ALTA Homeowner's Policy of Title Insurance (10-17-98)

*Deceptive Insurance Practice*

# CHICAGO TITLE INSURANCE COMPANY

601 RIVERSIDE AVENUE, BUILDING V-5, JACKSONVILLE, FL 32204



*Lewis "Four" Dunton, IV, Esq.*
*Vice President*
*Compliance and Regulatory Counsel*
*Direct Line: (904) 701-6164*
*Email: Lewis.DuntonIV@fnf.com*

April 3, 2013

By Electronic Mail
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
info@consumerfinance.gov

To Whom It May Concern:

You are receiving this correspondence in response to a complaint (Exhibit 1) Ms. Starsha Sewell filed with the Consumer Financial Protection Bureau ("CFPB") against Fidelity National Financial, Inc. and Chicago Title Insurance Company (collectively, "CTIC"), Capital Area Title, LLC d/b/a: Universal Title ("Universal Title"), First Home Mortgage Corporation ("First Home") and Coldwell Banker real estate agent, Linda Harris.

Please note CTIC's former agent, Universal Title, handled the transaction identified in Ms. Sewell's complaint and not CTIC. CTIC merely underwrote the title insurance policies Universal Title issued in connection with this transaction. As such, some of Ms. Sewell's complaints may be more appropriately answered by one or more of the aforementioned entities or parties.

Ms. Sewell's complaint to the CFPB raises four separate allegations, which are addressed as follows:

1) Good faith belief RESPA was violated because of "undisclosed kickbacks".

   A review of Universal Title's closing file for this matter did not reveal any "undisclosed kickbacks" or any other inappropriate money disbursements. The HUD-1 Settlement Statement (Exhibit 2) and the Single Ledger Balance Report (Exhibit 3) reflect all disbursements made, including Universal Title's settlement charges and the $192.99 title insurance premium Universal Title remitted to CTIC for the CTIC underwritten owner's and lender's title insurance policies issued by Universal Title.

2) Whether Universal Title issued "a title insurance policy that was not designed to protect the title of [Ms. Sewell's] home"?

The title insurance policy (Exhibit 4) Universal Title issued to Ms. Sewell was a standard American Land Title Association ("A.L.T.A.") Homeowner's Policy of Title Insurance (10-17-98). A.L.T.A. is the national trade association for the title insurance industry. One of A.L.T.A.'s primary functions is the promulgation of standardized forms for the terms and conditions of title insurance policies, like the owner's policy Ms. Sewell purchased.

3) Whether the claims made are covered matters and reasons for the subsequent claim denial?

Title insurance policies are contracts of indemnity. They guarantee a purchaser's clear title to a piece of property at the time the policy is issued, which is usually contemporaneous with the property's acquisition. The policy holder pays a one-time premium for coverage against defects in the chain of title. As such, title insurance policies typically only provide coverage for past events in the property's history.

The issues presented in Ms. Sewell's claim are matters that were either expressly excepted or excluded from coverage under the policy. Specifically, the purchase money deed of trust Ms. Sewell granted to First Home was excepted from coverage (See Exhibit 4, item 7). This deed of trust is logically excepted as an insured matter because: 1) this encumbrance securitized the loan Ms. Sewell obtained from First Home to purchase the property and 2) First Home also obtained a lender's title insurance policy from Universal Title to guarantee its priority interest in the property in the event the purchase money loan was not repaid.

Also, as stated above, since title insurance insures a purchaser's clear title at the time it's issued, any events affecting the title thereafter would be excluded from coverage. Because the foreclosure proceeding affecting Ms. Sewell's property occurred after the policy was issued, it transpired "post-policy" and is, thus, not covered.

4) Whether the foreclosure was conducted illegally?

This question is more appropriately answered by Ms. Sewell's former lender or loan servicer. However, pursuant to This Declaration of Substitution of Trustees (Exhibit 5), it appears First Home assigned the indebtedness secured by the deed of trust to the Maryland Department of Housing and Community Development ("MD HCD"). MD HCD, in turn, substituted out as trustees David E. Waters and Anthony B. Olmert, Sr. and replaced them with Ms. Shannon Menapace, a duly licensed attorney and member of the Maryland and Washington, D.C. bar associations. Upon information and belief, Ms. Menapace, as MD HCD's duly authorized trustee, thereafter foreclosed on MD HCD's deed of trust.

With Regards,

Lewis W. Dunton, IV, Esq.
Vice President
Compliance and Regulatory Counsel

2

Exhibit · **B**



# Chicago Title Insurance Company

September 18, 2013

**Via Facsimile & U.S. Mail**
Mr. David Zitterbart
Maryland Insurance Administration
200 St. Paul Place, Suite 2700
Baltimore, Maryland 21202
david.zitterbart@maryland.gov
410-468-2307

|     |                   |                                                     |
| --- | ----------------- | --------------------------------------------------- |
| Re: | MIA File No.:     | 193645-P-2013-DAZ-C                                  |
|     | Our Claim No.:    | 447883                                              |
|     | Complainant:      | Starsha Sewell                                      |
|     | Property Address: | 7020 Independence Street, Capitol Heights, Maryland |

Dear Mr. Zitterbart:

Please allow this letter to serve as the response from Chicago Title Insurance Company (the "Company") to the Maryland Insurance Administration's ("MIA") inquiry dated August 12, 2013 regarding the Company's denial of the above-referenced claim. You requested that we provide the following:

1. a complete copy of the policy including a pro forma jacket;
2. a detailed accounting of the investigation of the claim; and
3. copies of all correspondence concerning this claim.

Further, you requested that we provide detailed responses regarding the following alleged concerns of the Complainant:

1. the policy issued by the agent insured clear title to the property;
2. the individual who purchased from CDA, Ms. Nicole Nicolson, financed the property as new construction when in fact the property is fifty-four (54) years old and that the Company insured this transaction;
3. the Company did not properly review the records to ensure clear title; and
4. the Company reinsured a property purchased from a fraudulent foreclosure sale.

Enclosed please find the requested documentation. The following will address the remainder of your requests.

Ms. Sewell's claim was initially tendered to the Company on or about November 17, 2012. The facts surrounding Ms. Sewell's claim and the Company's investigation are as follows. On or about January 10, 2008, Ms. Sewell purchased the property commonly known as 7020

Mr. David Zitterbart
Maryland Insurance Administration
MIA File No.: 193645-P-2013-DAZ-C
September 18, 2013
Page 2 of 4

Independence Street, Capitol Heights, Maryland ("Subject Property") from Express Homebuyers DC, LLC. The deed evidencing this purchase was recorded on January 16, 2008 at Book 29215, Page 468 in the current public records of Prince George's County, Maryland. In connection with this transaction, Capital Area Title, LLC, doing business as Universal Title, issued Ms. Sewell an ALTA Homeowner's Policy of Title Insurance (10-17-98) naming Ms. Sewell as the Company's insured owner (the "Policy").

According to Ms. Sewell's claim letter, she alleges that she was subjected to wrongful and/or fraudulent foreclosure practices in connection with the foreclosure and sale of the Subject Property. Ms. Sewell also claimed that subsequent transfers of the Subject Property were illegal and/or fraudulent.

The Company's investigation included reviewing a complete title search of the Subject Property and all the recorded documents in the public records. The Company also contacted Universal Title, the policy-issuing agency, and reviewed all of the documentation in the transactional file associated with Ms. Sewell's purchase. Additionally, the Company reviewed the documents and correspondence that were submitted by Ms. Sewell along with her claim letter.

The Company's review of the foregoing determined that the Substitute Trustee's Deed which is questioned by Ms. Sewell is dated March 16, 2011 and recorded on May 18, 2011 at Book 32682, Page 131. This deed conveys the Subject Property from the substitute trustee, Shannon Menapeace, to Community Development Administration of the Department of Housing and Community Development ("CDA"). The consideration recited in the deed is $153,000.00. According to the Substitute Trustee's Deed, the specific deed of trust which was foreclosed was recorded in the land records at Book 29215, Page 474. The foreclosure action was docketed in the Circuit Court for Prince George's County as Case No.: CAE09-38954. The CDA subsequently conveyed the Subject Property to Nicole Nicholson via deed dated April 6, 2012 which was recorded on April 27, 2012 at Book 33567, Page 488.

When Ms. Sewell purchased the Subject Property, she granted and executed a purchase money deed of trust in the amount of $308,447.00 to First Home Mortgage Corporation which was recorded on January 16, 2008 at Book 29215, Page 474 ("First Mortgage Deed of Trust"). The recorder's office in Prince George's County identifies this deed of trust as Instrument No.: 4362.

Schedule B of the Policy, which states that the following matters are specifically excepted from coverage:

*In addition to the Exclusions, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:*

7.    *Deed of Trust dated October 10, 2008 from STARSHA M. SEWELL to DAVID E. WATERS and ANTHONY B. OLMERT, SR., Trustee, securing FIRST MORTGAGE CORPORATION in the original principal amount of $308,447.00 and recorded January 16, 2008 in the of [sic] PRINCE GEORGE'S County, Maryland as Instrument # 4362.*

Mr. David Zitterbart
Maryland Insurance Administration
MIA File No.: 193645-P-2013-DAZ-C
September 18, 2013
Page 3 of 4

Based on the information discovered during the Company's investigation, the Company issued its first coverage letter dated February 25, 2013, stating that Ms. Sewell's claim was respectfully denied because any foreclosure or issue related to a foreclosure involving the First Mortgage Deed of Trust was specifically excepted from coverage in Schedule B of the Policy.

Ms. Sewell requested a reconsideration of the Company's coverage determination via email dated March 15, 2013. In support of her request, she alleged that the substitute trustee and/or foreclosing lender engaged in an alleged fraudulent scheme by foreclosing on the Subject Property and subsequently conveying title to Nicole Nicholson.

Contemporaneously, Ms. Sewell filed a complaint with the Consumer Financial Protection Bureau ("CFPB") against the Company on or about March 25, 2013 which is enclosed for your review. The Company responded to the CFPB via electronic mail on April 3, 2013.

Please note that the Company's response to the CFPB outlines how Ms. Sewell's understanding of the Policy is incorrect. The exclusions of the Policy specifically provide that there is no coverage under the Policy for any matter that first occurs after the policy date. Therefore, since the alleged illegal title transfer to the CDA and then to Nicole Nicholson did not occur until February 2010 and/or March 2011, these transfers would be excluded from coverage and not covered under the terms of the Policy.

Subsequently, the Company issued the second coverage letter to Ms. Sewell via letter dated April 25, 2013. The Company's second coverage determination cited the applicable exclusion contained in the Policy, which states:

> *In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:*
>
> *4.      Risks:*
>
> *d.      That first occur after the policy date--this does not limit the coverage described in covered risk 7, 8.d, 22, 23, 24 or 25.*

Therein, the Company specifically stated that any foreclosure and subsequent title transfer would be excluded from coverage based on the above and excepted from coverage based on Schedule B of the Policy. Therefore, the claim was again respectfully denied.

The Company has informed Ms. Sewell that title insurance policies are contracts of indemnity. The policies guarantee a purchaser's clear title to a piece of property at the time the policy is issued, which is usually contemporaneous with the property's acquisition by the insured owner. The policies insure against defects subject to the conditions, stipulations, exclusions and exceptions contained within the specific policy. As a result, any issues Ms. Sewell raises involving the subsequent transfer of the Subject Property being classified as new construction or questioning the validity or legality of the conveyance would be excluded from coverage under the Policy because all of these issues first arose after the policy date as stated in Schedule A.

Mr. David Zitterbart
Maryland Insurance Administration
MIA File No.: 193645-P-2013-DAZ-C
September 18, 2013
Page 4 of 4

It is my understanding Ms. Sewell contacted Milestone Title, the settlement company that handled the conveyance of the Subject Property from CDA to Nicole Nicholson on April 6, 2012. It appears Ms. Nicholson's owner's policy is a Fidelity National Title Insurance Company ("Fidelity National Title") title insurance policy. However, neither the Company nor Fidelity National Title was involved in the settlement of the transaction beyond that of Fidelity National Title being the title insurance underwriter of the policy issued by Milestone Title. The fact that Fidelity National Title is the underwriter on Ms. Nicholson's owner's policy is not relevant to the analysis of Ms. Sewell's claim, because again, any matter that first occurs after the Date of Policy would be excluded from coverage under the Policy (Ms. Sewell's policy).

Based on the foregoing, it is the Company's continued position that the allegations involved in Ms. Sewell's claim are respectfully denied because they are excepted and excluded from coverage under the terms of the Policy.

If you have any further questions regarding this matter, please feel free to contact me by phone at (904) 854-8723 or via email at doug.booher@fnf.com. You may also contact Nate Tincher, who is the claims counsel responsible for this matter, either by phone at (904) 701-6112 or via email at nate.tincher@fnf.com.

Sincerely,

Douglas A. Booher
Senior Vice President
Chief Claims Counsel – Eastern Region

Enclosures

SDAT: Real Property Search

Exhibit 

Go Back
View Map
New Search
GroundRent
Redemption
GroundRent
Registration

Maryland Department of Assessments and Taxation
Real Property Data Search (vw5.1A)
PRINCE GEORGE'S COUNTY

## Account Identifier:
District - 18 Account Number - 2079846

### Owner Information

| | |
|---|---|
| **Owner Name:** | NICHOLSON NICOLE L |
| **Mailing Address:** | 7020 INDEPENDENCE ST<br>CAPITOL HEIGHTS MD 20743- |

| | |
|---|---|
| **Use:** | RESIDENTIAL |
| **Principal Residence:** | YES |
| **Deed Reference:** | 1) /33567/ 00488<br>2) |

### Location & Structure Information

**Premises Address**
7020 INDEPENDENCE ST
CAPITOL HEIGHTS 20743-0000

**Legal Description**
ESTATES

| Map | Grid | Parcel | Sub District | Subdivision | Section | Block | Lot | Assessment Area | Plat No: | A-3618 |
|---|---|---|---|---|---|---|---|---|---|---|
| 0066 | 00E3 | 0000 | | 2500 | | R | 7 | 3 | Plat Ref: | |

| Special Tax Areas | Town | NONE |
|---|---|---|
| | Ad Valorem | |
| | Tax Class | 8 |

| Primary Structure Built | Enclosed Area | Property Land Area | County Use |
|---|---|---|---|
| 1959 | 1,034 SF | 9,951 SF | 001 |

| Stories | Basement | Type | Exterior |
|---|---|---|---|
| 1.000000 | YES | SPLIT FOYER | FRAME |

### Value Information

| | Base Value | Value As Of 01/01/2012 | Phase-in Assessments As Of 07/01/2012 | As Of 07/01/2013 |
|---|---|---|---|---|
| Land | 45,500 | 45,500 | | |
| Improvements: | 202,900 | 107,400 | | |
| Total: | 248,400 | 152,900 | 152,900 | 152,900 |
| Preferential Land: | 0 | | | 0 |

### Transfer Information

| Seller: | COMMUNITY DEV ADMIN DEPT OF HOUSING COMM DEV | Date: | 04/27/2012 | Price: | $125,000 |
|---|---|---|---|---|---|
| Type: | NON-ARMS LENGTH OTHER | Deed1: | /33567/ 00488 | Deed2: | |
| Seller: | SEWELL STARSHA M | Date: | 05/18/2011 | Price: | $153,000 |
| Type: | NON-ARMS LENGTH OTHER | Deed1: | /32682/ 00131 | Deed2: | |
| Seller: | EXPRESS HOMEBUYERS DC LLC | Date: | 01/16/2008 | Price: | $299,900 |
| Type: | ARMS LENGTH IMPROVED | Deed1: | /29215/ 00468 | Deed2: | |

### Exemption Information

| Partial Exempt Assessments | Class | 07/01/2012 | 07/01/2013 |
|---|---|---|---|
| County | 000 | 0.00 | |
| State | 000 | 0.00 | |
| Municipal | 000 | 0.00 | 0.00 |

| Tax Exempt: | Special Tax Recapture: |
|---|---|
| Exempt Class: | NONE |

### Homestead Application Information
**Homestead Application Status:** No Application

Exhibit
D





Precepts in Action

# CODE OF BUSINESS
# CONDUCT & ETHICS

## January 2014

**Q:** One of my good customers has asked me to pay part of the seller's proceeds to the buyer in a transaction I am handling for him. He has also asked that I not disclose this on the HUD-1 settlement statement. Would this be okay since I have a long-standing relationship with this customer?

**A:** No, this is not okay under any circumstance. This type of payment could be seen as a kickback and/or mortgage fraud. Moreover, all disbursements must be accurately disclosed on the HUD-1 settlement statement and approved by the lender financing the transaction. Any questions on this topic should be referred to National Escrow Administration, Corporate Compliance Department or the Compliance/Ethics Hotline.



## Responsibility to Our Customers and Business Partners

### Fraud

All employees are expected to be vigilant in discovering evidence of possible fraud that might affect FNF. Fraud is any material misrepresentation or deliberate act of an employee, customer, agent or contract service provider (for example, an outside attorney, accountant, or industry insider, such as an appraiser, mortgage broker, realtor or real estate agent) with the purpose of deceiving or cheating FNF, its shareholders, customers, employees, lenders, regulators or business partners. Employees are required to report evidence of suspected fraud in accordance with the reporting provisions of this Code.

### Examples of Fraud:
- Forgery or alteration of checks, securities, invoices, policies, escrow documents or accounting records;
- Any misappropriation of FNF funds, securities, supplies, furniture, equipment or other assets;
- Any misuse of or irregularity in handling and reporting escrow, trust or indemnity funds;
- Any material misrepresentation or omission of information with the intent to deceive or mislead a lender into extending credit that would likely not be offered if the true facts were known; or
- Any fraud committed with the intent to steal money from a lender.

### Improper Payments

The use of FNF funds for any unlawful purpose or in violation of stated Company policies is prohibited. No bribes, kickbacks or similar remuneration or consideration of any kind are to be given or offered to any individual, organization, government, political party or other entity or representative thereof, for any reason.

### Protection of Customers' Personal Information

The Safeguards Rule, implemented as part of the Gramm-Leach-Bliley Act, and other federal and state laws and regulations provide specific guidelines regarding the privacy, protection and security of customers' personally identifiable information.

Additionally, the federal Fair Credit Reporting Act (FCRA), as amended by the Fair and Accurate Credit Transactions Act of 2003 (FACTA), is, among other things, meant to ensure the accuracy, proper use and protection of a customer's personal financial information contained in a consumer credit report. The use of personal financial information of a customer contained in a consumer credit report is also governed by the laws of many states.

The goal of these laws and regulations is, among other things, to prevent identity theft. All employees must strictly comply with Company policies and relevant laws and regulations relative to the protection and use of customers' personal information?

### Protection of Cardholder Information

The Payment Card Industry Data Security Standards (PCI DSS) are a widely-accepted set of policies and procedures intended to optimize the security of credit, debit and cash card transactions and protect cardholders against misuse of their personal information. If your position involves the processing, storage and/or transmission of cardholder information, you are required to protect such data in accordance with Company policies relative to the protection of cardholder information.

> **Do the Right Thing**
> - Never provide a customer's personal, financial or cardholder information to a person not authorized to receive that information, including unauthorized fellow employees.
> - If you are sending a customer's personal, financial or cardholder information to a person authorized to receive it, always send such information by secure transmittal, such as via encrypted email.
> - Never obtain information on a customer from a consumer reporting agency under false pretenses.

*For more information on this topic, refer to the Corporate Information Security Policy and Privacy Policy.*

Exhibit 2

**Subject:** Report of Fraud_ Misappropriation and Identity Theft

**From:** Starsha Sewell (smsewell2002@yahoo.com)

**To:** DLGiannino@co.pg.md.us;

**Cc:** smsewell2002@yahoo.com;

**Date:** Monday, February 10, 2014 4:42 PM

----- Forwarded Message -----
**From:** IDTheft <IDTheft@oag.state.md.us>
**To:** 'Starsha Sewell' <smsewell2002@yahoo.com>
**Sent:** Wednesday, September 18, 2013 11:41 AM
**Subject:** RE: Report of Fraud_ Misappropriation and Identity Theft

Thanks. I will send you some info through the mail as well.

**From:** Starsha Sewell [mailto:smsewell2002@yahoo.com]
**Sent:** Wednesday, September 18, 2013 11:38 AM
**To:** IDTheft
**Subject:** Re: Report of Fraud_ Misappropriation and Identity Theft

Hi Jeff,

My Mailing address is P.O. Box 7073 Capitol Heights, MD 20791. I filed a report with Baltimore FBI.

Thanks,
Starsha Sewell

**From:** IDTheft <IDTheft@oag.state.md.us>
**To:** 'Starsha Sewell' <smsewell2002@yahoo.com>
**Sent:** Wednesday, September 18, 2013 11:10 AM
**Subject:** RE: Report of Fraud_ Misappropriation and Identity Theft

Hi Starsha,

I have a few follow up questions. Do you have a mailing address? Have you filed a police report in connection with any of the below events?

Thank you,
Jeff Karberg

**From:** Starsha Sewell [mailto:smsewell2002@yahoo.com]
**Sent:** Wednesday, September 11, 2013 1:52 PM
**To:** IDTheft
**Subject:** Re: Report of Fraud_ Misappropriation and Identity Theft

Hello Jeff,

I do not have a telephone at this time. However, I would be happy to write in response to any questions that you may have if this will assist you with your investigation.

Thanks,
Starsha

**From:** IDTheft <IDTheft@oag.state.md.us>
**To:** 'Starsha Sewell' <smsewell2002@yahoo.com>
**Sent:** Wednesday, September 11, 2013 9:25 AM
**Subject:** RE: Report of Fraud_ Misappropriation and Identity Theft

I will review the message and documents. If you have time, could you give my office a call sometime this week?

I have attached some general ID theft information. Additionally, here is a link to the FTC's ID theft guidebook: http://www.ftc.gov/bcp/edu/pubs/consumer/idtheft/idt04.pdf. Please call or email if you have any further questions/concerns. I can be reached at jkarberg@oag.state.md.us or 410-576-6574.

Thank you,
Jeff Karberg
(410) 576-6574
Administrator
Identity Theft Unit
http://www.oag.state.md.us/idtheft/index.htm

---

**From:** Starsha Sewell [mailto:smsewell2002@yahoo.com]
**Sent:** Tuesday, September 10, 2013 8:17 PM
**To:** IDTheft
**Subject:** Report of Fraud_ Misappropriation and Identity Theft

Hello,

I filed a complaint regarding foreclosure fraud and illegal title transfer. Additional research, shows that the foreclosure affidavit is a product of fraud and subsequent title transfer in connection with this real estate transaction is also a product of fraud.

According to your website:

**"Fraud** is the **intentional deception** or misrepresentation that an individual knows, or should know, to be false, and makes, knowing the deception could result in some unauthorized benefit to himself/herself or some other person".

Shannon Menapace intentionally placed my name in the SDAT system as the seller, because she and her client "Bogman, Inc" engaged in wrongful foreclosure practices. I did not sell CDA the property addressed at 7020 Independence Street, Capitol Heights, Md 20743 on May 18, 2011. Furthermore, when I requested a disposition review from Assistant Attorney General Anthony Mohan. He conveyed that the substituted trustee sold CDA the property; therefore, her strategic and intentional

placement of my name in the SDAT property assessment database is direct evidence of misappropriation.

I have attached a copy of a FOIA request. The home was reported as a New construction into HUD's database, but the property is 54 years old. Starsha Sewell's name  was entered into the SDAT database as the seller, However, Shannon Menapace handled this transaction. I would like to file my complaint against Shannon Menapace,for misappropriation, because she is an attorney who handled the transaction according to the attached FOIA request.

In law, **misappropriation** can be both a criminal and a civil violation. In civil law in the United States, many states define misappropriation as the unauthorized use of another's name, likeness, or identity without that person's permission, resulting in harm to that person. For an example, see §1803. In criminal law, misappropriation is the intentional, illegal use of the property or funds of another person for one's own use or other unauthorized purpose, particularly by a public official, a trustee of a trust, an executor or administrator of a dead person's estate or by any person with a responsibility to care for and protect another's assets (a fiduciary duty). It is a felony, a crime punishable by a prison sentence.

I would greatly appreciate a response. Thank you for your time.

Sincerely,
Starsha Sewell
smsewell2002@yahoo.com

HUD > Program Offices > Housing > Single Family > REO > Good Neighbor > HUD Good Neighbor Next Door Program

# About Good Neighbor Next Door

Law enforcement officers, pre-Kindergarten through 12th grade teachers, firefighters and emergency medical technicians can contribute to community revitalization while becoming homeowners through HUD's Good Neighbor Next Door Sales Program. HUD offers a substantial incentive in the form of a discount of 50% from the list price of the home. In return you must commit to live in the property for 36 months as your sole residence.

How the Program Works

Eligible Single Family homes located in **revitalization areas** are listed exclusively for sale through the Good Neighbor Next Door Sales program. Properties are available for purchase through the program for seven days.

How to Participate in Good Neighbor Next Door

Check the **listings for your state**. Follow the instructions to submit your interest in purchasing a specific home. If more than one person submits an offer on a single home a selection will be made by random lottery. You must meet the **requirements** for a law enforcement officer, teacher, firefighter or emergency medical technician and comply with HUD's regulations for the program.

HUD requires that you sign a **second mortgage and note** for the discount amount. No interest or payments are required on this "silent second" provided that you fulfill the **three-year occupancy requirement**.

The number of properties available is limited and the list of available properties changes weekly.

To learn more, please see our Good Neighbor Sales **Frequently Asked Questions**.

Comments and Questions

**Related Information**

›**Good Neighbor Mortgages**
›**Homeownership Centers**
›**HUD FHA Property Listings by State**
›**Revitalization Areas**

$Exhibit\ 4$



Starsha Sewell <sluvyahweh3@gmail.com>

---

### 3 title insurance firms agree to California refunds, penalties Fidelity National Financial Jacksonville, FL

1 message

---

**Starsha Sewell** <sluvyahweh3@gmail.com>
To: smsewell2002@yahoo.com, Starsha Sewell <sluvyahweh3@gmail.com>

Tue, Oct 28, 2014 at 2:13 AM

http://shar.es/10bSQE

In a case involving thousands of California home buyers, three title insurance companies have agreed to pay $37.8 million in refunds and penalties to settle accusations of kickbacks that state...

This message was sent using ShareThis (http://www.sharethis.com)

## THE NATION

# 3 title insurance firms agree to California refunds, penalties

July 24, 2005|By Dale Kasler and Andrew LePage, New York Times News Service: The Sacramento Bee.

SACRAMENTO — In a case involving thousands of California home buyers, three title insurance companies have agreed to pay $37.8 million in refunds and penalties to settle ☐ accusations of kickbacks that state officials say drove up the price of title insurance.

California Insurance Commissioner John Garamendi, in announcing the settlement ☐ last week, said the three companies devised a scheme to route "illegal kickbacks" to banks, home builders and real estate firms in exchange for referrals.

The settlement represents the biggest component to date of an investigation launched by Garamendi last fall. But the commissioner said his office is still investigating whether the industry is so anti-competitive that he should seek rate reductions.

Similar investigations have been undertaken by insurance regulators in other states.

Title insurance costs an average of $1,400 in California and is required by lenders when a house is sold. The coverage essentially guarantees that the seller owns the property that's changing hands and no liens are filed against it.

Home buyers ☐ can shop on their own for title insurance but typically use a company recommended by their agent, lender or builder. Garamendi said the scheme effectively raised the cost of insurance in 82,000 transactions over the last few years.

In these case, customers "were not routinely sent to the low-cost insurer, but to the insurer promising the Realtor, lender or builder the biggest kickback," the Department of Insurance said.



The settlement includes $25.3 million in refunds, or about $300 per consumer.

The sum includes $15 million already pledged to Californians by First American Title Insurance Co. of Santa Ana. First American made that commitment in connection with an earlier settlement reached with regulators in Colorado.

Two other title insurers were involved: Fidelity National Financial ☑ Inc. of Jacksonville, Fla., and LandAmerica Financial Group Inc. of Richmond, Va. Also included were subsidiaries of Fidelity and LandAmerica.

All three companies announced in February they have discontinued the arrangements that sparked the investigation. Combined, the three control about 75 percent of the title insurance market in California.

Insurance officials said First American is in the process of sending out refund checks, while LandAmerica and Fidelity are working with the state Department of Insurance on a refund plan. Michael Strumwasser, special counsel ☑ to the department, said consumers should call their title companies for information.

Garamendi said the scheme involved establishment of a group of reinsurance firms.

Reinsurers are companies that share some of the risk incurred by the primary insurers. But Garamendi said these reinsurance companies were controlled by 43 real estate firms, home ☑ builders and lenders, and existed only to take kickbacks from the primary title insurers. He said the title companies routed about half their premiums to these reinsurers.

"This reinsurance scheme appears to be nothing more than a form of commercial bribery," Garamendi said in a prepared statement.

Garamendi, in an interview, said the scheme also suggests the primary insurers are making excessive profits. "There was enough fat in the system to give away up to 50 percent of the premium dollar to obtain business in an illegal kickback scheme," he said. "So draw your own conclusions."

He released a list of 43 companies that he said established the reinsurance firms in order to receive kickbacks. The list included some of the biggest lenders, builders and real estate firms in the state.

One of those, Wells Fargo Home Mortgage ☑, said in a prepared statement, "We can assure our customers that our title reinsurance services operate in an appropriate manner that bears no resemblance to those companies under scrutiny."

Because Garamendi can only investigate insurance companies, he urged other state agencies to examine the practices of the lenders, real estate firms and builders he named.

Related Articles

- Title insurance kickbacks probed
  February 24, 2005
- Iowa serves as a standard in probes of title-insurance...
  July 17, 2005
- Regulators taking tough look at title insurance
  January 22, 2006
- Shop for title insurers as well as real estate agents
  December 2, 2007

Find More Stories About

- Insurance

Terms of Service
Privacy Policy
Index by Date



Index by Keyword
www.chicagotribune.com
**Connect**

- Like us on Facebook
- Follow us on Twitter

### Chicago Tribune

&amp;lt;div&amp;gt; &amp;lt;img src="//secure-us.imrworldwide.com/cgi-bin/m?ci=us-400338h&amp;amp;amp;cg=0&amp;amp;amp;cc=1&amp;amp;amp;ts=noscript" width="1" height="1" alt="" /&amp;gt; &amp;lt;/div&amp;gt;

AdChoices



Exhibit 4b

# States Probe a Kickback Scam

*Title insurance is focus of investigation*

BY: Alan Greenblatt | April 2005

O nce again, state regulators are investigating wrongdoing in the financial services sector. This time, title insurance companies are in the spotlight for allegedly giving kickbacks to builders, developers and real estate brokers who send business their way. Insurance commissioners in half a dozen states are looking into the practice, and one multimillion-dollar settlement has already been reached.

The scheme begins with sellers, lenders and agents creating subsidiaries, known as "captive" reinsurers, to write reinsurance policies. They then steer business to a particular title insurance company in exchange for the company ceding big chunks of the premium back to the reinsurer, in effect saving builders and others hundreds of dollars on each transaction. The cost to home buyers, who are required to carry title insurance to protect against losses in case a property title is questioned, remains the same or may even be higher.

"These contracts are nothing less than commercial bribes," says California Insurance Commissioner John Garamendi, who is calling executives of top title companies to testify at a public hearing April 4.

The Colorado Division of Insurance is also taking action. In February, it announced a settlement with First American Title Insurance Co., which will send refunds totaling $24 million to consumers, and it is also negotiating a settlement with another company. Deputy Insurance Commissioner Erin Toll said that nine of the 24 title companies doing business in Colorado are facing sanctions for alleged kickbacks, an arrangement that she says has served to shut out smaller companies that don't offer the payments.

A First American spokesman said the company settled with Colorado to avoid any appearance of a conflict, and the other companies under investigation also deny wrongdoing. According to Lloyd Osgood of LandAmerica, reinsurers only get a share of premiums in exchange for taking on a real share of the risk and consumers have the option to shop around among title companies. "Our captive reinsurance arrangements have not resulted in any injury to consumers," she says.

---

This article was printed from: **http://www.governing.com/topics/finance/States-Probe-a-Kickback-Scam.html**

---



*EXhibit 5*

# U.S. Senate `flipping' hearing set for Baltimore

## Officials, victims to speak on rapid housing resales

March 20, 2000|By John B. O'Donnell | John B. O'Donnell,SUN STAFF

A U.S. Senate hearing on the wave of property "flipping" that has swept across Baltimore in the past four years will be held March 27 at the World Trade Center.

Sen. Barbara A. Mikulski, a Maryland Democrat, is expected to lead the hearing by the Senate subcommittee that handles the U.S. Department of Housing and Urban Development budget. Mikulski is the senior Democrat on the panel, which is headed by Sen. Christopher S. Bond, a Missouri Republican. Bond is not expected to attend.

Maryland Sen. Paul S. Sarbanes, the senior Democrat on the Banking Committee, which has legislative jurisdiction over HUD, will take part in the hearing.

More than 2,000 Baltimore houses have been bought and quickly resold in the past four years for price increases of at least 100 percent -- and sometimes as much as 1,000 percent. The deals usually involve dilapidated rowhouses. Inflated appraisals and falsified documents often are part of the transactions, which defraud buyers and mortgage lenders.

Two months ago, Mikulski criticized HUD for "subsidizing fraud." While most flips have been financed with conventional mortgages, critics say that hundreds of mortgages have been insured by the Federal Housing Administration, a HUD agency.

HUD has not been asked to send anyone to testify at the hearing, said Johanna Ramos-Boyer, Mikulski's press secretary. Mikulski will question HUD officials about flipping at a subcommittee hearing in Washington three days later, Ramos-Boyer said.

Witnesses at the Baltimore hearing will include Lynn Battaglia, U.S. attorney for Maryland, and Richard M. Mosquera, head of the FBI office in Baltimore. Battaglia is coordinating federal investigations by several agencies, including the FBI, the Postal Inspection Service and the HUD inspector general.

Victims of flipping also are scheduled to testify, along with Vincent Quayle, who heads the St. Ambrose Housing Aid Center, and Ken Strong, director of Southeast Community Organization. The two nonprofit groups are trying to combat flipping.

Three General Assembly members from Baltimore who have introduced anti-flipping legislation, Democratic Dels. Carolyn J. Krysiak, Maggie L. McIntosh and Samuel I. Rosenberg, will talk about their bills.

Another Senate panel, the Permanent Subcommittee on Investigations, is probing flipping in Baltimore and several other cities and planning a spring hearing.


Exhibet 6

Recent News

## Fidelity National Title Group Announces New Program to Curb Mortgage Fraud

« Previous Releases | Next Releases »

Company partners with Experian Consumer Direct to help protect its customers from identity theft Jacksonville, Fla., June 26, 2007 – Fidelity National Title Group, a wholly-owned subsidiary of Fidelity National Financial, Inc. (NYSE:FNF), a leading provider of title insurance, specialty insurance and claims management services, today announced a new product offering that will help its customers protect against mortgage fraud. The new partnership with Experian Consumer DirectSM will offer customers one year of credit monitoring, fraud resolution assistance and a credit report at no cost.

"We recognize that mortgage fraud and identity theft are a growing concern not only for our industry, but for our customers as well," said Randy Quirk, co-president of Fidelity National Financial. "Our business is protecting the largest financial transaction most Americans make in their lives – buying a house. Now, when our customers purchase title insurance from participating locations of our companies – Fidelity National Title, Chicago Title, Ticor Title, Security Union Title or Alamo Title – they will receive a one-year membership to Experian Consumer Direct's CreditCheck    Basic at no cost."

Fidelity National Title Group's offering is the first of its kind in the title insurance industry, providing customers with daily monitoring of their Experian credit report, a comprehensive Experian credit report delivered online and e-mail alert notifications to inform them of key changes to their Experian credit report including new inquiries, newly opened accounts, delinquencies, address change and public record items. Toll-free support from fraud resolution representatives and educational information also are included in the year-long credit monitoring membership.

"Consumers are often most at risk for identity theft after a big transaction—such as buying or refinancing a house," continued Quirk. "Every day, our title insurance providers are doing all they can to combat

real-estate fraud. Our products protect a homeowner's future by insuring the ownership of their home. It was a natural fit for us to partner with Experian to provide our customers with a reliable product to continue monitoring their credit after the transaction, empowering them to further protect their identity and investment."

"Our credit monitoring products give consumers peace of mind knowing that we monitor their credit report on a daily basis and will alert them of any key changes that could be a result of fraud or identity theft," said Ty Taylor, president of Experian Consumer Direct. "We are proud to join Fidelity National Title Group in its campaign to protect consumers and stifle mortgage fraud across the United States."

Fidelity National Title Group plans to roll out this offering in the coming weeks to California and Texas, quickly followed by expansion in the states where Fidelity National Title Group companies offer title insurance. Implementation of the program in various states may require, and is subject to, appropriate regulatory approval.

### About Fidelity National Financial, Inc.

Fidelity National Financial, Inc. (NYSE:FNF), is a leading provider of title insurance, specialty insurance and claims management services. FNF is one of the nation's largest title insurance companies through its title insurance underwriters - Fidelity National Title, Chicago Title, Ticor

Title, Security Union Title and Alamo Title - that issue approximately 29 percent of all title insurance policies in the United States. FNF also provides flood insurance, personal lines insurance and home warranty insurance through its specialty insurance business. FNF also is a leading provider of outsourced claims management services to large corporate and public sector entities through its minority-owned subsidiary, Sedgwick CMS. More information about FNF can be found at www.fnf.com.

## About Experian Consumer Direct

Experian Consumer Direct is part of Experian InteractiveSM and a market leader for online credit reports, scores and monitoring products delivered directly to consumers. Among its products, the business provides consumers with instant access to their credit report and credit score, plus credit monitoring products that monitor all three national credit reports daily and include identity theft insurance and fraud resolution. Experian Consumer Direct has established integrated, co-branded partnerships with leading online financial destinations that provide consumers with a broad range of comprehensive online financial products and information essential to managing one's financial life. For more information, visit www.experian.com.

## About Experian

Experian® is a global leader in providing analytical and information services to organizations and consumers to help manage the risk and reward of commercial and financial decisions. Combining its unique information tools and deep understanding of individuals, markets and economies, Experian partners with organizations around the world to establish and strengthen customer relationships and provide their businesses with competitive advantage. For consumers, Experian delivers critical information that enables them to make financial and purchasing decisions with greater control and confidence. Clients include organizations from financial services, retail and catalog, telecommunications, utilities, media, insurance, automotive, leisure, e-commerce, manufacturing, property and government sectors.

Experian Group Limited is listed on the London Stock Exchange (EXPN) and is a constituent of the FTSE 100 index. It has corporate headquarters in Dublin, Ireland, and operational headquarters in Costa Mesa, Calif., and Nottingham, UK. Experian employs approximately 13,500 people in 36 countries worldwide, supporting clients in more than 60 countries. Annual sales are $3.5 billion.

For more information, visit the Group's Web site at www.experiangroup.com.

Experian and the marks used herein are service marks or registered trademarks of Experian Information Solutions, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners

This press release contains forward-looking statements that involve a number of risks and uncertainties. Statements that are not historical facts, including statements about our beliefs and expectations, are forward-looking statements. Forward-looking statements are based on management's beliefs, as well as assumptions made by, and information currently available to, management. Because such statements are based on expectations as to future economic performance and are not statements of fact, actual results may differ materially from those projected. We undertake no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise. The risks and uncertainties which forward-looking statements are subject to include, but are not limited to: changes in general economic, business and political conditions, including changes in the financial markets; adverse changes in the level of real estate activity, which may be caused by, among other things, high or increasing interest rates, a limited supply of mortgage funding or a weak U. S. economy; our potential inability to find suitable acquisition candidates, acquisitions in lines of business that will not necessarily be limited to our traditional areas of focus, or difficulties in integrating acquisitions; our dependence on operating subsidiaries as a source of cash flow; significant competition that our

operating subsidiaries face; compliance with extensive government regulation of our operating subsidiaries; and other risks detailed in the "Statement Regarding Forward-Looking Information," "Risk Factors" and other sections of the Company's Form 10-K and other filings with the Securities and Exchange Commission.

Contact:
Emily Crane
Hill & Knowlton for Fidelity National Financial
202 944 5137
Emily.Crane@hillandknowlton.com

Kelly Poffenberger
Experian Public Relations
949 567 7634
kelly.poffenberger@experian.com

© 2015 Fidelity National Financial, Inc.

iPhone Investor Home | View Complete IR Website